# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MAYFIELD SWD, L.L.C., and<br>CLAYTON HAMPTON, | )<br>)<br>) | |
| Plaintiffs, | ) | |
| vs. | ) | NO. CIV-10-0467-HE |
| MIKE BLEVINS, et al., | )<br>)<br>) | |
| Defendants. | ) | |

## ORDER

This case arises out of a dispute between various participants in the saltwater disposal business.[1]  According to the amended complaint, plaintiff Clayton Hampton and defendant Mike Blevins formed Mayfield SWD, L.L.C. ("Mayfield") in 2005 for the purpose of conducting a commercial saltwater disposal business in Beckham County, Oklahoma.  In 2007 and 2008, Blevins established competing commercial disposal companies (defendants Trigger's Disposal L.L.C. and Whitaker Disposal L.L.C.) with members of his family, the other individual defendants in this case.  Based on various alleged actions of Blevins, plaintiff Hampton filed suit in this court in 2009, asserting claims against Blevins for breach of fiduciary duty, unjust enrichment, and also asserting derivative claims which Mayfield purportedly had against Blevins and his family members.

Jurisdiction in the 2009 suit was asserted based on diversity of the parties.  However,

---

[1]According to the amended complaint, fluids other than oil and gas, typically saltwater, may be produced from an oil or gas well.  That fluid is ordinarily disposed of by collection and transport to a disposal facility.

due to the lack of diversity between the parties, the court dismissed the case. Order [CIV-09-0856-HE, Doc. #22]. Some time later, plaintiffs re-filed this suit asserting essentially the same claims under state law, but adding an additional defendant (Chad Blevins) and adding claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and for antitrust violations based on Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[2] Plaintiffs rely on these federal claims as the basis for jurisdiction in this court. Defendants have moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss any direct claims of plaintiff Hampton and the claims of all plaintiffs insofar as they are based on the indicated federal statutes. Defendants also seek, upon dismissal of the federal claims, the dismissal of the remaining state claims here by reason of pendent jurisdiction. The motion is fully briefed and at issue.

The standard for determination of a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is familiar. Rule 12(b)(6) permits a court to dismiss a claim when a party fails "to state a claim upon which relief can be granted." When considering whether the plaintiffs' claims should be dismissed under Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff, the nonmoving party. Peterson v. Grisham, 594 F.3d 723, 727 (10th Cir. 2010) (citation omitted). A claim will be dismissed if "the complaint does not contain enough facts to state a claim to relief that is

---

[2]*In this case, Mayfield appears as a plaintiff asserting direct claims against the defendants. However, as defendants contend and plaintiffs generally concede, the proper procedure for a derivative suit would have been for Mayfield to be named a defendant, and subsequently realigned, if necessary.*

2

plausible on its face." Anderson v. Suiters, 499 F.3d 1228, 1232 (10th Cir. 2007) (internal quotations omitted). "'[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims.'" Id. (quoting Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)). Applying these standards to the challenged portions of the Amended Complaint, the court concludes defendants' motion to dismiss should be granted.

## DISCUSSION

### A. "Direct" Versus Derivative Claims.

Defendants maintain that plaintiffs' direct claims should be dismissed, arguing that plaintiff Hampton has not alleged a basis for a claim in his favor (as opposed to those of Mayfield) and that Hampton, as a 50% interest owner in the LLC, lacks the authority to cause Mayfield to assert directly any claims that it may have. They argue that, in the circumstances of this case, the only proper claims are derivative in nature.[3] Plaintiffs essentially concede the point and seek leave to file a further amended complaint re-aligning Mayfield as a defendant and asserting only derivative claims on behalf of it. In light of that and given the

---

[3]*For example, Hampton does not have the standing to directly assert either the RICO or antitrust claims, because the alleged injury under those claims is to Mayfield, not Hampton. See Tal v. Hogan, 453 F.3d 1244, 1253-54 (10th Cir. 2006) (finding an individual owner and president lacked standing to assert individual RICO and antitrust claims, because the company was the one actually injured by these activities, not the individual).*

3

disposition of this case,[4] plaintiffs will be permitted to amend their complaint to correctly align the parties to the extent the court permits amendment.

**B. RICO Claims.**

Plaintiffs assert a claim based on 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To assert a violation of this statute sufficient to withstand 12(b)(6) scrutiny, the complaint must allege the defendants (1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. Tal v. Hogan, 453 F.3d 1244, 1269 (10th Cir. 2006). Further, based on 18 U.S.C. § 1964(c), which authorizes a private right of action for violation of the statute, a plaintiff must allege a basis for concluding that the alleged RICO violation was the proximate cause of the plaintiff's injury. Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992). Here, defendants' motion challenges the sufficiency of the complaint in two respects. It argues there is no showing of a pattern of "racketeering activity" within the meaning of § 1962 and that a basis for the necessary "proximate cause" element is not alleged.

With respect to the "racketeering activity" element, plaintiffs claim that defendants' conduct constituted a violation of what has been described as Oklahoma's "commercial

---

[4]*For convenience, this order will continue to refer to the claims of "plaintiffs" without, unless specifically indicated, further belaboring the direct or derivative nature of the claims.*

bribery" statute, 21 Okla. Stat. § 380. They allege that defendants offered a series of "bribes"—cash payments or vouchers—to the drivers of the tank trucks hauling the salt water and other fluids, to encourage the drivers to deliver their loads to defendants' facilities.[5]

For purposes of RICO, "racketeering activity" includes any act or threat which involves "bribery" under state law and which is punishable by imprisonment for more than a year. 18 U.S.C. § 1961(1)(A). A violation of Oklahoma's bribery statute, 21 Okla. Stat. § 380, is punishable by more than a year's imprisonment, hence the question becomes whether the complaint alleges a basis for each element of the statute so as to make out the necessary predicate act. Tal v. Hogan, 453 F.3d at 1263 ("Failure to adequately allege any one of the . . . elements is fatal to the . . . claim.").

It is a violation of 21 Okla. Stat. § 380B to offer a "bribe" the acceptance of which would constitute a violation of § 380A. Subsection 380A makes it a crime for a fiduciary—defined to include an "agent or employee"[6]— to accept a bribe "with a corrupt intent and without the consent of his beneficiary . . . ." Plaintiffs argue the allegations as to payments (cash or vouchers) to tank truck drivers show violation of this statute. However, defendants argue the complaint contains no allegations as to any corrupt intent on the part

---

[5]*According to the complaint, the saltwater transported to the disposal site normally contains a relatively small amount of oil or other hydrocarbons in the fluid. The hydrocarbons can be separated from the saltwater and sold by the disposal facility as reclaimed oil, providing income to the facility over and above the normal fees for fluid disposal. The complaint alleges that unscrupulous tank truck drivers may remove more oil than normal as part of the saltwater or other fluids they are hauling and that the "bribes" were intended, in part, to encourage drivers to bring such "high oil cut" loads to defendants' facilities.*

[6]*21 Okla. Stat. § 380C(2)(a).*

5

of the drivers or any basis for concluding that the "bribes" were received by the drivers without the consent "of his beneficiary"—the trucking companies which employed the drivers. The court concurs. While it is true, as plaintiffs argue, that it is difficult or impossible to offer specific alleged facts as proving a particular intent or mental state, the complaint does not even make a general, conclusory allegation as to the corrupt intent of the various drivers.[7] Further, it is silent as to whether the alleged payments were or were not consented to by the trucking companies. A conclusory reference to "bribes" or "kickbacks" does not solve the problem, as there is no obvious reason why payments to truck drivers would necessarily be any more corrupt or contrary to an employer's wishes than, say, an airline's award of frequent flier miles to an employee traveling on company business. In these respects, the amended complaint fails to allege a basis for violation of 21 Okla. Stat. § 380 and hence of the predicate act upon which its RICO claim is based.[8]

Defendants also argue that the allegations of the amended complaint show the absence of the necessary "proximate cause." The court concurs. As noted above, § 1964(c) is the basis for a plaintiff's private right of action where the plaintiff suffers injury "by reason of" the RICO violation. This requires a showing that the RICO violation "not only was a 'but

---

[7]*"Unscrupulous" does not, in and of itself, describe the mental intent of the tank truck drivers.*

[8]*Defendants also suggest, based on the general "bribery" definition in 21 Okla. Stat. § 97, that bribery can occur only if someone receives it in a "public or official capacity." That argument is inconsistent with the language of 21 Okla. Stat. § 380 which, in its definition of "fiduciary," makes clear that § 380 was intended to extend to bribes offered or received by corporate officers and others in a variety of private employment settings.*

for' cause of [plaintiffs'] injury, but was the proximate cause as well." Holmes, 503 U.S. at 268. That showing in turn requires a determination of whether the relationship between the alleged violation and claimed injury is sufficiently direct.

Like so much in the somewhat ethereal world of civil RICO,[9] the question is difficult and the answer less than obvious. However, the court concludes a basis for proximate cause, within the meaning of § 1964(c), is not present here. In Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006), the Supreme Court addressed the proximate cause requirement in circumstances similar to those alleged here. The context was a commercial dispute between competitors, where the underlying "pattern of racketeering activity" involved the defendant's alleged practice of not charging its cash customers sales tax that was otherwise due and then filing fraudulent tax returns to cover up the practice. The plaintiff alleged this conduct constituted wire fraud or mail fraud, depending on the manner of submission of the tax returns, and gave the defendant a competitive advantage in the marketplace. In affirming the dismissal of plaintiff's complaint, the Supreme Court stated that, when a court "evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Id. at 461. It concluded plaintiff's alleged injury was not sufficiently direct.

The Anza court identified a number of factors leading to its conclusion. The direct

---

[9]*It is sometimes difficult to envision how, even after a detailed and thorough explanation of the fine points of RICO's "enterprises," "patterns," and the like, a properly instructed jury's reaction could be other than a blank stare.*

7

victim of the challenged conduct—the filing of false tax returns—was the State of New York, which lost tax revenues. Id. at 457-58. Here, similarly, the direct victim of the alleged bribery scheme is either the trucking companies whose drivers accepted benefits or inducements that should actually have gone to the company or the well owners whose oil was taken when unscrupulous truck drivers, hoping to get more or bigger "bribes," "skimmed" more than the usual amount of oil or hydrocarbons when hauling the saltwater. Plaintiffs were not the direct victims.

Anza also notes the problem of ascertaining the amount of a plaintiff's damages attributable to the claimed RICO violation, as opposed to other independent factors. Id. at 458. It discussed the related fact that any lost sales experienced by plaintiff might have resulted from a variety of factors. It noted the "speculative nature of the proceedings" that would follow if plaintiff were allowed to pursue his claim. Id. at 458-59. Largely the same circumstances exist here. Any losses experienced by plaintiff might conceivably be, at least in part, the result of the inducement scheme plaintiffs allege. But they might also be the result of new entrants into the market, such as Whitaker and Trigger, wholly unrelated to any claimed illegal or improper activity, or of other factors such as the convenience of the location of particular disposal facilities relative to particular wells and the like.[10]

Applying the approach employed in Anza, the court concludes the amended complaint

---

[10]*The complaint alleges that some drivers drove past plaintiffs' more convenient site to dispose of their loads at a less convenient one and no doubt such results are a possible result of the alleged scheme. But undergirding the proximate cause analysis is not merely the question of whether the challenged conduct might have caused some injury-in-fact, but whether, considering all the factors, it proximately did so in a way and to an extent that is readily ascertainable.*

8

fails to state a claim both with respect to the proximate cause requirement and, as discussed above, the existence of an underlying predicate act of racketeering activity. The deficiencies as to the underlying predicate act might conceivably be remedied by amendment but, in the court's view, the proximate cause requirement cannot. Accordingly, the RICO claim will be dismissed.

**C. Antitrust Claims.**

As noted above, plaintiffs assert claims under both Sections 1 and 2 of the Sherman Act. As to the Section 2 claims, plaintiffs assert both monopoly and attempted monopoly claims. Defendants generally challenge the sufficiency of the amended complaint due to its reliance on, among other things, conclusory, rather than factual, allegations.

The amended complaint wholly fails to state a plausible claim based on Section 1 of the Sherman Act. Section 1 (15 U.S.C. § 1) provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

Section 1 is directed to agreements which unreasonably restrain trade. Standard Oil Co. v. United States, 221 U.S. 1, 59-60 (1911). The essence of a claim for a violation of Section 1 is the agreement (i.e. the contract, combination or conspiracy). Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1082 (10th Cir. 2006). Section 1 does not prohibit all restraints of trade, but only those effected by a contract, combination or conspiracy. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 553 (2007) (citing Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775 (1984)). "[T]he crucial question is whether the

9

challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" Id. (quoting Theater Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)). Here, the amended complaint is silent as to any such agreement. The allegations are, in substance, that defendant Mike Blevins formed two new companies which compete with Mayfield. With each, he is alleged to have acted with his brother or his sons. There is no allegation of any agreement between the two new companies, or with respect to the individuals, which might result in a restraint on competition. There is nothing in the nature of the actions plaintiffs object to—the alleged "bribery" of drivers—which requires coordinated action for it to work.[11] Some sort of concerted action is required. Native American Distributing v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288, 1297 (10th Cir. 2008). The only references in the facts of the complaint to any sort of concerted action are those alleging that Mike, Steve, Jarrod and/or Chad Blevins "acted in concert" to set up and run Trigger or to set up and run Whitaker, not anything which impacted competition in the sense required for an antitrust claim. In short, the amended complaint omits any substantial reference to the threshold requirement for a Section 1 claim—that the defendants have agreed or combined in some way so as to restrain competition.[12]

---

[11]*See Twombly, 550 U.S. at 566, noting there was nothing in the particular actions challenged there which necessarily implied conspiracy or other joint action.*

[12]*Given the alleged relationships between the defendants, it is questionable whether the necessary agreement or conspiracy, within the meaning of Section 1, could be plausibly alleged. See generally, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984) (addressing ability of officers and related entities to conspire for purposes of Section 1).*

To state a Section 1 claim, a plaintiff must also allege a basis for concluding that the agreement unreasonably restrains trade. The focus of a Section 1 claim "is confined to a consideration of impact on competitive conditions." National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 690 (1978). In general, the question is not whether the challenged conduct causes injury to a particular market participant such as Mayfield, but rather whether there is an injury to competition. Courts generally apply one of two methods of analysis to determine whether an agreement unreasonably restrains competition—the *per se* rule and the rule of reason. Here, plaintiffs argue defendants' conduct is *per se* illegal and that, even if that standard is not applicable, they still state a claim under the rule of reason standard.

*Per se* analysis is restricted to those restraints "that would always or most always tend to restrict competition and decrease output." Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1119 (10th Cir. 2008) (internal citation omitted). Moreover, there is a presumption in favor of the rule of reason standard. Bus. Elecs. Corp. v. Sharps Elecs. Corp., 485 U.S. 717, 726 (1988). Courts have generally applied the *per se* approach only to certain recognized types of behavior with which the courts have substantial experience, including horizontal and vertical price-fixing agreements, group boycotts, market allocation, and certain types of tying agreements. *See* Key Financial Planning Corp. v. ITT Life Ins. Corp., 828 F.2d 635, 640 (10th Cir. 1987) (price fixing; group boycotts); Bunker Ramo Corp. v. United Business Forms, Inc., 713 F.2d 1272, 1284 (7th Cir. 1983) (stating all). Here, the conduct upon which plaintiffs base their antitrust claims do not fall within any of the

11

recognized categories for *per se* treatment. Indeed, in a case with many similarities to the present dispute, the Tenth Circuit has rejected the use of the *per se* standard, concluding that the rule of reason test should apply. Midwest Underground Storage, Inc. v. Porter, 717 F.2d 493 (10th Cir. 1983) (involving antitrust claims against a business co-owner who formed a new entity to compete). The circumstances alleged here are not such that *per se* analysis is warranted.

The complaint is insufficient to make out a plausible Section 1 violation even under the rule of reason approach. This approach requires the court to "analyze the relevant market power of the defendants and therefore requires the plaintiff to allege a valid market." Campfield, 532 F.3d at 1119. Here, plaintiffs allege the product market to be the market to provide disposal services for saltwater, flow back fluid and associated oil. The geographic market is defined this way: "The relevant geographic market is a 100 mile radius for competing disposal wells." Amended Complaint [Doc. #6, ¶48]. It is not clear whether plaintiffs allege a single relevant market based on a 100 mile radius around the Mayfield well or whether they rely on multiple zones around multiple competing wells. What is clear is that plaintiffs allege no facts to support either description. Further, the amended complaint is totally silent as to any other facts upon which a determination of market power might be based. There is no indication of the number of entrants in the pertinent market, however defined. There is no indication of market share for plaintiffs, defendants, or anyone else. There is no allegation that prices have increased in the relevant market as a result of anything

defendants did or that there has been any injury to the market as a whole.[13] An allegation that Mayfield has lost some of its business to defendants does not make out a basis for showing a violation of the antitrust laws which, as noted above, are focused on injury to the market rather than to a particular competitor.

In short, the amended complaint fails to make out a plausible basis for a Section 1 Sherman Act claim due to both the absence of any allegation of an agreement and the absence of allegations that would support a finding of unreasonable restraint of trade.

Claims under Section 2 of the Sherman Act may involve claims of either monopoly or attempted monopolization, and plaintiffs assert both here. A claim based on a monopoly violation requires a showing of (1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power. United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); Christy Sports, LLC v. Deer Valley Resort Co., Ltd., 555 F.3d 1188, 1192 (10th Cir. 2009). Claims for attempted monopolization must show (1) that defendant engaged in predatory or anti-competitive conduct, (2) with a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power in the relevant market. Spectrum Sports Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

The discussion above regarding the sufficiency of the allegations as to market power in a Section 1 context is equally applicable to the Section 2 monopolization claim. The

---

[13]*A showing that one competitor dropped its prices and that others then dropped their prices to compete does not, without more, show a violation of any kind. Rather, it will often describe the very competition the antitrust laws were designed to protect and encourage.*

13

complaint alleges no factual basis for concluding that defendants had monopoly power in the relevant market and the Section 2 monopolization claim fails for that reason.

Similarly, the absence of allegations as to market power or to competitive conditions in the market renders the complaint insufficient as to the attempted monopolization claim. There has been no showing made as to a basis for concluding that a dangerous probability of achieving market power exists. Further, the allegations as to defendants' payments of cash or vouchers to the drivers do not, in and of themselves, make out a basis for a conclusion of predatory or anti-competitive conduct.

It is true that, in a proper case, predatory pricing of a product may be the basis for a monopolization or attempted monopolization claim. However, "predatory pricing" does not mean <u>any</u> lowering of prices—that may be the essence of competition. Rather, <u>predatory</u> pricing means "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." <u>Cargill, Inc. v. Monfort of Colo., Inc.</u>, 479 U.S. 104, 117 (1986). Here, there is no suggestion in the complaint that the disposal services offered by defendants were priced below cost or that, apart from plaintiffs' conclusory references to "bribes" and "kickbacks," the pricing was otherwise "predatory."

Stripped to its essentials, the complaint alleges nothing more here than that defendants priced their product—disposal services—lower than they previously had and that they did so through a series of cash payments or vouchers to the truck drivers who hauled the loads. Viewed purely from the standpoint of competitive markets, how is the payment/voucher

14

approach any different from the impact that a pure price cut would have had? If the defendants concluded that, based on the resale value of the reclaimed oil in the disposal loads, they could afford to charge less for each load and make their profit on the oil resale, and acted on that assumption by reducing disposal prices, does that circumstance conflict with the purposes of the Sherman Act? The court concludes it does not. Price cuts by one market participant may well force others, desiring to maintain their competitive position, to match them. The resulting reduction in profit margins may well be unpleasant for competing players like plaintiffs but does not, in and of itself, constitute conduct the antitrust laws seek to prohibit or limit. Indeed, absent more than is alleged here, the result is that which the antitrust laws seek to promote.

The court concludes the amended complaint fails to state a claim under either Section 1 or Section 2 of the Sherman Act.

**D. Effect of Dismissal.**

The court having concluded that the amended complaint fails to state a claim as to the federal claims upon which jurisdiction in this court depends, the question then becomes what effect that determination has or should have. Defendants argue the remaining claims should be dismissed as they are here only as a matter of supplemental jurisdiction and, with the dismissal of the related federal claims, no basis for further jurisdiction over them exists in this court. *See* 28 U.S.C. § 1367(c). Plaintiffs presumably would prefer an opportunity to amend and cure the deficiencies in their federal claims, along with the other changes they have sought leave to include in a further amended complaint.

Given the nature of the underlying dispute, there is much in the present circumstances to suggest that plaintiffs' efforts to make out a RICO or antitrust claim as a basis for federal jurisdiction involve many square pegs and round holes. It seems clear enough, as the initial complaint in this case seemed to acknowledge, that the real dispute between Mr. Hampton and Mr. Blevins (Mike Blevins) is most readily analyzed and, if appropriate, remedied through an action for breach of fiduciary duty or a similar unfair competition claim under state law.[14] That being the case, this court would be disposed to decline to exercise supplemental jurisdiction so as to require the pertinent state claims to be resolved in a state forum. However, while the court would approach any further effort by plaintiffs to state a Sherman Act claim with considerable skepticism, the court cannot say, on the present record, that any such effort would be so obviously futile as to preclude further amendment. The fact that a state law claim for breach of fiduciary duty might be a better vehicle for resolving the present dispute does not necessarily mean it is the exclusive means for doing so. Accordingly, for the reasons stated above, defendants' motion to dismiss [Doc. #31] is **GRANTED**. Plaintiffs' civil RICO and federal antitrust claims are **DISMISSED**. The civil RICO claim is dismissed with prejudice. Leave is granted to plaintiffs to file, **within 14 days**, a further amended complaint seeking to remedy the deficiencies in their Sherman Act claims if they can do so. In such event, the further amended complaint should also include

---

[14] See *Midwest Underground Storage Inc. v. Porter*, 717 F.2d at 497, noting that the policing of particular unfair methods of competition has generally been left to state law and that the Sherman Act should not be viewed as a "mandate to regulate unfair competition."

revisions necessary to accomplish the changes as to "direct" and "derivative" claims referenced in the parties' briefs. Absent such further filing within 14 days, this case will be dismissed in its entirety.

**IT IS SO ORDERED**.

Dated this 19th day of January, 2011.

JOE HEATON
UNITED STATES DISTRICT JUDGE